**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RICHARD B. DEMAREST, JR.,

        Petitioner,

v.                                    Case No. 8:13-cv-75-T-36TBM

SECRETARY, DEPARTMENT
OF CORRECTIONS,

        Respondent.

_____/

## ORDER

      Petitioner Richard B. Demarest, Jr., an inmate in the Florida Department of Corrections proceeding *pro se*, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 1).  He challenges his convictions entered in 2004 by the Circuit Court for the Sixth Judicial Circuit, Pinellas County, Florida.  Respondent filed a response (Dkt. 9) and Demarest filed a reply (Dkt. 14).  Upon review, the petition must be denied.

## PROCEDURAL HISTORY

      Demarest was charged with capital sexual battery (counts one and two) and lewd or lascivious molestation (counts three and four).  (Dkt. 11, Ex. 1, Vol. I, pp. 57-59.)[1]  A jury convicted him as charged on counts one, three, and four, and of the lesser-included offense of lewd and lascivious molestation on count two.  (*Id.*, pp. 97-100.)  Demarest was sentenced to concurrent terms of life in prison on count one, and thirty years in prison on counts two, three, and four.  (*Id.*, pp. 104-110.)  The state appellate court *per curiam*

---

[1] Although Demarest was also charged with lewd and lascivious act in the presence of a child under the age of 16, this count was ultimately dismissed.  (Dkt. 11, Ex. 1, Vol. I, pp. 57-59; Ex. 1, Add. 2, p. 502.)

affirmed Demarest's convictions and sentences.

Demarest filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.  (Dkt. 11, Ex. 6.)  The state court entered an order summarily denying claim one and granting an evidentiary hearing on claim two.  (Dkt. 11, Ex. 9.)  Demarest's motion to supplement his postconviction motion was dismissed.  (Dkt. 11, Exs. 10, 11.)  It appears that, at some point after granting the evidentiary hearing, the court appointed counsel to represent Demarest.  Postconviction counsel filed an amended postconviction motion with regard to claim two.  (Dkt. 11, Ex. 17.)  After conducting an evidentiary hearing, the state court entered a final order of denial.  (Dkt. 11, Exs. 20, 21.)  The state appellate court *per curiam* affirmed the rejection of Demarest's postconviction claims.  (Dkt. 11, Ex. 25.)  Respondent does not contest the timeliness of Demarest's federal habeas petition.

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.,* 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied,* 531 U.S. 840 (2000).  Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section 2254(d), which sets forth a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied–the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Beli v. Cone*, 535 U.S. 685, 694 (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  *Accora Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United

States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693.  In other words, "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster,* _U.S._, 131 S. Ct. 1388, 1398 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

In *per curiam* decisions without written opinions, the state appellate court affirmed both Demarest's convictions and sentences, as well as the rejection of Demarest's postconviction motion.  These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby,* 538 U.S. 906 (2003). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state

court. *Pinholster,* 131 S. Ct. at 1398.  Demarest bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### Ground One

During an interview with police, Demarest confessed orally and in writing.  Demarest claims that the state trial court erred in denying his motion to suppress his confession, resulting in a violation of his constitutional rights.  In his motion to suppress, Demarest asserted that he invoked his right to counsel before making any admissions and that police lied about the presence of DNA evidence to intimidate him into confessing.  (Dkt. 11, Ex. 1, Vol. I, p. 71.)  The state trial court denied Demarest's motion, and the state appellate court rejected his claim of trial court error when it affirmed his convictions and sentences.[2]

### I.

The state trial court conducted an evidentiary hearing on Demarest's motion. Demarest did not testify at the hearing. The State presented testimony of Investigator Diane Martin and Detective Joseph Coyle.  The allegations against Demarest were brought by his two step-daughters, with whom he lived until he separated from their mother.  At the time of the offenses, victim H.W. was eight years old, and victim N.W. was ten years old. (Dkt. 11, Ex. 1, Vol. III, pp. 140, 145; Vol. IV, p. 216.)  The victims stated that the crimes

---

[2] The assertion of trial court error Demarest raised on direct appeal (Dkt. 11, Ex. 2) is liberally construed as having presented a federal claim.  Further, the claim raised in his federal habeas petition is liberally construed as raising the claim presented to the state appellate court.

occurred when they were alone with Demarest after coming home from school.  During the investigation, Martin and Coyle located Demarest at an apartment, and he agreed to talk to them about the allegations. (Dkt. 11, Ex. 1, Vol. II, pp. 141-42.)  Martin testified that, when she and Coyle located Demarest, he identified himself and indicated that he knew "what this is about" and knew that law enforcement had been looking for him for several months.  (*Id.,* p. 142.)

Demarest was taken to the police station.  Martin provided Demarest with *Miranda*[3] warnings at the outset of the interview.  (*Id.*, pp. 144-45.)  She testified that she went over each right with him, including his right to an attorney, and that he signed and initialed a *Miranda* waiver form.  (*Id.*, pp. 144-47.)[4]  Martin testified that Demarest did not say anything indicating he wished to invoke his rights.  (*Id.,* p. 147.)

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] The form states:

1.       You have the right to remain silent.
2.       Anything you say can and will be used against you in a court of law.
3.       You have the right to talk to a lawyer and have him present with you while you are being questioned.
4.       If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.
5.       You can decide at any time to exercise these rights and not answer any questions or make any statements.

(Dkt. 11, Ex. 1, Vol. I, p. 125.)  The initials "RD" are next to this part of the form.  The form also contains the following waiver:

I have read this statement of my MIRANDA RIGHTS and I understand what my rights are. I am willing to talk with the police and/or give written statements to them.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made towards me nor has any force or pressure been used against me to make me cooperate or help the police.

I swear or affirm that my statements are the truth, the whole truth, and nothing but the truth.

(*Id.*)  The form contains Demarest's signature below this waiver.  (*Id.*)

Martin testified that Demarest stated he was sometimes alone with the victims at home after school. (*Id.*, p. 149.)  She and Coyle recalled Demarest telling them that there were incidents when he saw the victims without their clothes on and that N.W. "flashed" him. (*Id.*, pp. 150, 195.)  Martin further testified that Demarest said N.W. saw Demarest and his wife, the girls' mother, engaged in a sexual act. (*Id.*, pp. 150-51.)  Martin testified that Demarest denied the allegations at this point, but when asked whether he thought the girls would lie about what happened, he said that he did not believe they would do so. (*Id.*, pp. 151-52.)

Martin discussed DNA and the process of comparing DNA samples during the interview. (*Id.,* p. 152.)  Demarest consented to providing a saliva sample, and did so. (*Id.*, pp. 154, 196.)[5]  After Demarest provided the sample, Coyle said that Demarest's DNA would match the DNA found at the scene. (*Id.*, p. 197.)  Martin asked Demarest if there was any reason for his DNA to match "anything on or about" either of the victims. (*Id.*, p. 155.)   Martin testified that Demarest thought about scenarios that could explain the presence of DNA and told them he had not been completely honest. (*Id.*, p. 157.)  After further discussion, Demarest orally confessed.   Both Martin and Coyle testified that Demarest told them, "You're right," and said that "everything" he was accused of "did happen." (*Id.*, pp. 158, 198-99.)  Martin testified that, after confessing, Demarest indicated that he felt sick about what he did and that he believed he needed a counselor. (*Id.*, pp. 166-67.)  Martin and Coyle both testified that they clarified whether Demarest meant legal

---

[5] The record contains a consent form signed by Demarest that reads, "I, Richard Demarest, knowingly and willingly, give my consent and permission to have a sample of my saliva collected by Det. Diane Martin of the Largo Police Department for any investigative purposes." (Dkt. 11, Ex. 1, Vol. I, p. 127.)

counsel or a "mental" counselor, and Demarest stated he was referring to a "mental" counselor. (*Id.*, pp. 166-67, 202.)  Martin and Coyle testified that Demarest never invoked his right to counsel at any time during the interview.  (*Id.*, pp. 163, 177-78, 194, 202.)

The officers provided Demarest an opportunity to write a statement.  (*Id.*, p. 165.) At this time, Demarest asked to use the bathroom and was allowed to do so.  (*Id.*, pp. 165, 201.)   During this break, Martin also got a soda for Demarest at his request.   (*Id.*) Demarest then completed a written statement on the back of the *Miranda* rights advisement form in which he described the events and apologized to the victims.  (*Id.*, pp. 167-69, 202.)[6] Martin testified that she told Demarest he did not have to write anything, but that he agreed to do so.  (Dkt. 11, Ex. 1, Vol. II, p. 167).  Coyle also testified that Demarest was not forced to write a statement, and did so voluntarily.  (*Id.*, p. 202.)

Martin and Coyle estimated that the interview lasted no longer than about two to three hours.  (*Id.*, pp. 170, 203).  Their testimony further reflects that no force or weapons were used to coerce Demarest or induce him into saying anything, and that no shouting or raised voices were involved.  (*Id.*, pp. 162, 197-98.)   The officers both testified that, although Demarest was transported to the police station in handcuffs, they were removed in the interview room.  (*Id.*, pp. 144, 191).

Martin and Coyle also explained that there was no DNA evidence in the case due to the passage of time between the offenses and the victims' reports of them.  (*Id.*, pp. 153, 197.)  However, Coyle testified that providing inaccurate information about evidence was

---

[6] The document containing Demarest's written confession states, "I HAVE READ AND WAIVED MY RIGHTS ON THE PRECEDING PAGE AND THIS IS MY FREE AND VOLUNTARY STATEMENT."  (Dkt. 11, Ex. 1, Vol. I, p. 126.)

an "interview technique" that, in his experience, could result in admissions. (*Id.*, p. 197.)

II.

Demarest asserts that the officers continued to interview him after he asked for an attorney during the interview, and argues that his confession should have been suppressed on this basis. After testimony concluded at the motion to suppress hearing, defense counsel stated that he "would have to concede that we don't have any evidence to - - or we have not presented any evidence contradicting the two detectives. So as to that alone, that would not be sufficient." (*Id.*, p. 213.) The court rejected Demarest's argument at the end of the hearing:

> As to the first ground, invoking right to counsel by requesting a lawyer, I think the evidence has shown otherwise. He did execute a written waiver form as to Miranda. Both the detectives testified unequivocally he never asked for counsel, and the only thing he referenced was a mental health counselor because of the nature of the things he had done. So clearly, there's no grounds to grant it.

(*Id.*, pp. 216-17.)

The state appellate court affirmed the trial court's decision, and the record supports this conclusion. *Miranda* holds that, in accordance with the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Therefore, a suspect subject to custodial interrogation must be warned prior to any questioning that he has the right to remain silent, that his statements can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be appointed prior to questioning if he cannot afford one. *Id.* at 478-79.

Demarest does not contest that he waived his *Miranda* rights, including his right to an attorney, when Martin provided these warnings.  Nor does he challenge the validity of this waiver.  Furthermore, the unopposed testimony at the motion to suppress hearing reflects that Demarest understood his right to counsel and knowingly and voluntarily made the decision to waive it.

If a suspect subsequently asks for an attorney, however, law enforcement must discontinue questioning.  When a suspect has "expressed his desire to deal with the police only through counsel," law enforcement must stop questioning until counsel is provided. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  *Edwards* creates a "'bright-line' rule' that *all* questioning must cease after an accused requests counsel." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (citation omitted) (emphasis in original).  Demarest's federal habeas claim that he invoked his right to counsel by clearly asking for an attorney during the interview is not supported by any record evidence before the state court at the time it denied his motion to suppress.  Martin and Coyle testified consistently that Demarest never asked for an attorney during the interview, and that his request for a "counselor" was made with regard to a mental health counselor.  Accordingly, Demarest fails to show that the state appellate court's rejection of his claim that the trial court erred in denying this aspect of his motion to suppress was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

III.

Demarest also challenges the denial of his motion to suppress on the basis that his confession was induced through law enforcement falsely informing him that DNA evidence was recovered from the scene.  Demarest claims these assertions were "a clear

misstatement of evidence" because there was no DNA, and that after he was "threatened

with fabracated [sic] evidence he made admissions that were improperly admitted at trial."

(Dkt. 1, p. 7.) Apparently in further support of his claim that his admissions were coerced,

Demarest contends in his federal habeas petition that he was cold and shaking during the

interview.

At the conclusion of the motion to suppress hearing, the state court rejected

Demarest's argument:

> The other - - clearly, they fabricated the possibility of DNA evidence. But I note for the record that he was not cuffed, that he was in there, that he had executed the Miranda waiver, and he had made some significant admissions before that, frankly. He indicated that he knew why the cops were there, that the young child had flashed him before, that they had seen - - or he had seen the one child and the mom doing the sexual act in the bedroom [sic].
>
> And he also said he didn't believe - - did he believe they'd lie about something this serious and he said no. So he had been giving them greater details about what had occurred and his involvement prior to the time that they had fabricated or brought up this DNA evidence. They used it as an interview technique to put him further - - to get him to make more admissions.
>
> And given the totality of the circumstances, the fact that he gave them full details and then wrote about it, I think it's clear that the overall statement was freely and voluntarily made. I don't think there's any evidence to suggest that it's not. It was an additional technique they used to get some further admissions. He had already admitted to some things, and they used that as a technique to get him to believe that they had evidence as a way of getting him to own up to the additional things that they were leading him to. I don't think there's any indication that overcame his free will or that it wasn't freely and voluntarily made, and that's borne out by the fact that, you know, they let him go to use the restroom, they told him he did not have to do a written statement if he chose not to, and instead he wrote out the written statement and gave some additional admissions there.
>
> So overall, I think the totality of the circumstances clearly establishes that the statements given, all of the statements, both written and oral, were freely and voluntarily made. As such, the Court will deny the defense's amended motion to suppress.

(Dkt. 11, Ex. 1, Vol. II, pp. 217-218.)

"[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession." *Jackson v. Denno*, 378 U.S. 368, 376 (1964). "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984) (internal quotation marks omitted). "This means that it 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id.* (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A confession is involuntary if the suspect's "will was overborne in such a way to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).

However, misstating the evidence, without more, is not the type of coercive police activity that results in an involuntary confession. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (an officer's false statement that suspect's companion confessed was insufficient to render the suspect's statement involuntary). Accordingly, misrepresentations of fact "are not enough to render a suspect's ensuing confession involuntary." *United States v. Lall*, 607 F.3d 1277, 1285-86 (11th Cir. 2010). "Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary." *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010). Rather, "courts have held statements involuntary because of police trickery only when other aggravating

circumstances were also present." *Id.* (citing *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984)).   Thus, "statements have been held involuntary where the deception took the form of a coercive threat, or where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them."   *Id.* (citations omitted).

As a preliminary matter, Demarest does not contest that he freely and voluntarily waived his right to remain silent when Martin provided him with *Miranda* warnings. Additionally, the Court's independent review of the record leads to the conclusion that Demarest's confession was voluntary under the totality of the circumstances.  The record reflects that Demarest indicated he knew why Martin and Coyle wanted to talk to him, and he agreed to do so.   Martin and Coyle testified consistently that Demarest was not handcuffed at the police station, that he was allowed a break to go to the bathroom when he asked for it, and that he was also given a drink at that time.   The interview lasted no more than about three hours.  The officers did not draw their weapons or use physical force at any time, nor did they raise their voices or yell at Demarest.  He does not contest that he voluntarily consented to providing a sample of his saliva. Additionally, the assertions in Demarest's federal habeas petition that he was cold and began to shake during the interview are not supported by evidence before the court when it ruled on the motion to suppress.

Furthermore, there is no evidence to indicate that any threats were made against Demarest, that anything was promised to him, or that the officers pressured him into making either written or oral statements.  Nor does the record support a finding that the officers' misstatements regarding DNA evidence were accompanied by, or amounted to,

a coercive threat or other aggravating circumstance that deceived Demarest about the nature of his rights or induced his confession.

Accordingly, the totality of the circumstances under which Demarest confessed reflects that his confession was voluntary and was not coerced by police misinformation about the existence of DNA.   Therefore, Demarest does not show that the state court's rejection of his claim of trial court error in denying his motion to suppress was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable application of the facts.   Demarest is not entitled to relief on Ground One.

### Ground Two

In Ground Two, Demarest alleges that he was deprived of his Sixth Amendment right to effective assistance of counsel.   He raises five sub-claims.   Ineffective assistance of counsel is a difficult claim to sustain.   "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).   Claims of ineffective assistance of counsel are analyzed under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> The law regarding ineffective assistance of counsel claims is well settled and well documented.   In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims.   According to *Strickland*, first, the defendant must show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.   This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.   *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).   In order to show deficient

performance, a petitioner must demonstrate that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.   However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*  Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

Demarest must demonstrate that counsel's alleged errors prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691-92.   To show prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Counsel's strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.  A petitioner cannot meet his burden merely by showing that counsel's choices were unsuccessful:

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Sustaining a claim of ineffective assistance of counsel on federal habeas review is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). *See also Pinholster*, 131 S. Ct. at 1410 (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

If a claim of ineffective assistance of counsel can not be resolved through one of the *Strickland* test's two prongs, the other prong need not be considered. 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

<u>Sub-claims A, C, and D</u>

In Sub-claims A, C, and D, Demarest asserts that trial counsel was ineffective for not thoroughly investigating his case and for failing to call exculpatory witnesses to show that he was not alone with the victims during the time the State alleged the crimes occurred. Due to the repetitive nature of the allegations raised in these three sub-claims, they are considered together. The Court first addresses the instances of ineffective

assistance of counsel that Demarest presented during postconviction proceedings.  The Court then considers a specific factual instance of ineffective assistance of trial counsel that is procedurally defaulted, but that Demarest asserts may nevertheless be reviewed under *Martinez v. Ryan*, _U.S._, 132 S.Ct. 1309 (2012).

I.

Demarest states that counsel should have called his mother, Charmalee Smith, his sister, Michelle Miller, and his nephews, who were Miller's sons,[7] to account for the victims' whereabouts during the times the offenses were alleged to have occurred.  He claims that such testimony would have supported his defense that he could not have committed the crimes and that his confession was coerced.

The State asserted that, during the month of September 1999, Demarest committed the offenses on weekdays after the victims returned home from school.  Both victims, H.W. and N.W., testified that Demarest committed the offenses after they came home from school.  (Dkt. 11, Ex. 1, Vol. III, pp. 144, 152; Vol. IV, p. 221.)  H.W. testified that she and her sister got out of school around 3:00 and got home at about the same time.  (Dkt.11, Ex. 1, Vol. III, p. 144.)  She stated that Demarest was already at home when they arrived.  (*Id.*, p. 152.)  H.W. indicated that Demarest worked in construction and that he was home for one or two hours as a sort of "lunch break" before returning to work.  (*Id.*)  She further testified that their mother did not come home until anywhere from 4:00 to 5:30 and "he would do all of it before my mother got home." (*Id.*, p. 144.)  H.W. testified that the offenses

---

[7] Demarest states counsel should have called Miller's three sons.  His petition and reply indicate that these individuals were J.P.B., J.B.1, and J.B.2.  Demarest referenced J.P.B. and J.B.1 in his postconviction motion, and counsel testified at the evidentiary hearing with regard to J.B.2.  Thus, this aspect of Demarest's claim is exhausted.

occurred over a period of about two weeks in September of 1999.  (*Id.,* p. 144-48, 153.)

N.W.'s testimony also indicated that when they came home from school in September,

Demarest was the only other person present.  (Dkt. 11, Ex. 1, Vol. IV, pp. 220-21.)  N.W.

stated that the offenses occurred over the course of two to four weeks, and happened after

school.  (*Id.*, p. 229.)

At trial, the defense called Kristine Karnosh.[8]   Karnosh, the ex-girlfriend of

Demarest's brother, testified that she lived with Demarest, his wife, and the victims from

about the middle or end of August 1999 until the middle or end of October 1999.  (Dkt. 11,

Ex. 1, Add. 1, p. 300.)  Karnosh testified that she could not recall if she started working at

the end of September or the end of October, but that before that point, she was present

when the girls came home.  (*Id.*, pp. 300-01.)  She testified that she would make them

dinner, assist them with homework, and help get them ready for bed.  (*Id.*, p. 301.)

Karnosh testified that Demarest was not home when the girls arrived, and that he often did

not come home until about 6:00 p.m.  (*Id.*)  She stated that the girls' mother typically came

home around 5:00 or 5:30 p.m.  (*Id.*)  Karnosh testified that the incidents would have had

to have occurred at a time other than immediately after school.  (*Id.*, pp. 310-11.)[9]

Demarest also testified at trial and denied the allegations. He testified that, during

September 1999, Karnosh lived in the house in return for taking care of the children

because he worked "a lot."  (*Id.*, p. 331.)  He further testified that he was not normally at

---

[8] The state record contains numerous spellings of this witness's name.  The trial transcript refers to
her as Kristine Karnosh.

[9] H.W. testified that she was not certain when Karnosh lived with the family, but that Karnosh was not
living with them at the time the incidents occurred.  (Dkt. 11, Ex. 1, Vol. III, p. 143.)  N.W. testified that when
they came from school Karnosh was at work.  (Dkt. 11, Ex. 1, Vol. IV, p. 220.)

home when the girls came home from school, and "[t]hat's why we had [Karnosh] there." (*Id.*)

The state court granted an evidentiary hearing on Demarest's claims that counsel was ineffective for failing to call witnesses. At the hearing, Demarest's sister Michelle Miller testified that she and Demarest worked for the same employer. She stated that during September 1999, Demarest was still at work when she left at 3:30 p.m. (Dkt. 11, Ex. 20, pp. 193-94.) Miller testified that, after work, she stopped at Demarest's house "[p]robably by 3:45" and picked up N.W. and H.W. (*Id.*, pp. 194-96.) Miller testified that Karnosh was present at this time. (*Id.*, p. 196.) From there, Miller stated, they went to Miller's home, where the girls and Miller's sons would have something to eat. (*Id.*, pp. 194-95) Then, Miller would drive all of the children to football and cheerleading practice that lasted from 6:00 to about 8:30. (*Id.*, p. 195.) Miller further testified that practice took place Mondays through Thursdays and that she had videos of practices and football games. (*Id.*, pp. 195, 199, 200, 207.) Miller testified that she dropped them off at home afterwards, and that Demarest, the victims' mother, and Karnosh were usually present. (*Id.*, p. 198.)

Thus, Miller testified, she could account for the victims' activities "Monday through Thursday" in September 1999 from about 3:45 to 9:00 p.m. (*Id.*, p. 199.) However, Miller conceded that in her deposition she testified that Demarest was alone with the victims "a lot." (*Id.*, pp. 202-03.) She further acknowledged that in her deposition she testified to picking the victims up from their home and taking them to practice, but made no mention of driving them back to her home for dinner. (*Id.*, p. 204.)

J.P.B., Demarest's nephew, testified that he was about fourteen years old in September 1999. (*Id.*, pp. 212-13.) He recalled that he would get home from school

around 4:15 or 4:20 and have something to eat.  (*Id.*, pp. 209-10.)  The victims were also at the house, and Miller drove all of the children to practice.  (*Id.*)  J.P.B. testified that practice took place on Mondays through Thursdays from about 5:00 to 7:30 or 8:00.  (*Id.*, pp. 211, 213.)  He testified that he did not know where the victims were before he arrived home from school.  (*Id.*, p. 213.)  Charmalee Smith, Demarest's mother, testified that Miller picked the girls up from their home after school on Mondays through Thursdays.  (*Id.*, p. 217.)  She stated that they came back to Smith and Miller's house, where Smith would feed all of the children.  (*Id.*)  She testified that Miller and the children left for practice at around 3:30 or 4:00.  (*Id.*, pp. 217, 219)  Smith had no personal knowledge of the girls' whereabouts before Miller picked them up.  (*Id.*, p. 219.)

Counsel testified that he hired an investigator in this case.  (*Id.*, p. 245.)  He further testified that, although he listed both Miller and Smith on a reciprocal witness list, he and Demarest agreed not to call them.  (*Id.*, p. 236.)  Counsel testified that he instead called Karnosh, who was a witness "not related [to Demarest] that was living with him at the time, and for the sole purpose of taking care of the kids."  (*Id.*)  Counsel recalled Karnosh's testimony concerning the victims' activities after school, and stated that it would have been inconsistent with testimony of Miller and Smith.  (*Id.*, p. 239.)  Although counsel acknowledged Karnosh stated in her deposition that the victims spent a significant amount of time with Miller and Smith, he believed that "if you look at the totality of [Karnosh's] testimony, her testimony is that she's with the kids during the relevant portions of the afternoon, and not that they leave to go to cheerleading practice or football practice."  (*Id.*, p. 251.)  Counsel testified that due to the contradictions in their statements, he believed he could either call Miller and Smith or call Karnosh.  (*Id.*, p. 239.)  Counsel testified that he

and Demarest discussed this "either or" situation and evaluated the potential witnesses. (*Id.*, pp. 239-40.)  Counsel testified that he recalled Demarest agreed to call Karnosh.  (*Id.*, p. 240.)

Counsel also noted that Miller's testimony would not account for the victims' whereabouts on Fridays.  (251-52.)  Counsel further recalled Miller's deposition testimony that Demarest was alone with the victims "a lot," and believed this would have been significant at trial.  (*Id.*, p. 241.)  Counsel also agreed that he listed J.B.2 as a potential witness and considered calling him but that he made a strategic decision, in conjunction with Demarest, to call Karnosh.  (*Id.*, p. 256.)

Demarest testified at the evidentiary hearing that he told counsel he believed Miller, Smith, and his nephews would be important witnesses, that he expected counsel to call them at trial, and that he reached no agreement with counsel not to call them.  (*Id.*, pp. 223-24.)  Demarest agreed, however, that when he testified at trial about the victims' whereabouts after school, he made no mention of Miller picking them up at the house.  (*Id.*, p. 226.)  He indicated that counsel did not ask him about Miller, but also conceded that he did not later inquire why counsel did not do so.  (*Id.*, p. 231.)

At the conclusion of the evidentiary hearing, the state court orally denied Demarest's claims, making extensive findings:

> The two prongs of *Strickland*, deficient performance and that it might have affected the outcome more from the language of the case; that the fairness and reliability of the proceeding that confidence in the outcome is undermined; those are the two prongs.
> The idea that this is deficient performance, I guess, it started out in the first motion because they didn't call Ms. Miller.  Then it was extended to Ms. Smith . . . and the nephew.  I'm not sure, just from the testimony, how that, you know, now 12 years later apparently there's more affirmative, helpful testimony that Ms. Miller would give, but at the time of the trial or at

the time of the depo, that wasn't the case.

She testified that, you know, or she didn't testify to anything about this taking him [sic] home between 3:30 and 5:00 and giving them meals before they went to football practice.  That apparently was not something that came out in her testimony in a deposition.  The stuff about taking them to football practice and being there from 6:00 to 8:30, but the initial stuff wasn't testified to [in] the depo and the client didn't testify to it at the trial.  And to argue that's because [counsel] didn't ask him the right questions, it's almost more susceptible of the interpretation that it's something that was made up after the fact because the whole idea of it wasn't something that was in existence at least to anybody's objective knowledge at the time either of the incident itself or the testimony in the '04 trial.  Because she didn't say anything about it in the depo and now she says, "Well, I guess I wasn't asked about it."  And he says he didn't testify about it.  He said, "Well, [counsel] didn't ask me the questions."  And then he was asked, "Well did you say anything to him afterwards about that," and the answer was "No."

So, despite opportunities, both of them have said that at the time neither of them indicated that that was what Ms. Miller would testify to.  So I'm not sure how that gets charged to [counsel].

Plus, with Ms. Miller's testimony, she testified in depo he was alone a lot with the girls.  And so the question becomes, I guess, the deficient performance is not calling Ms. Miller and then to a lesser extent Ms. Smith and the nephew to support that.  First between the nephew and Ms. Smith, there's some inconsistencies as to the time and what they could testify to.  So even that in and of itself lessens the need or what would appear to be the need to have them call Ms. Smith and the nephew.  And then you get, you know, these were things - - it's not like this is a situation that wasn't investigated.  He had an investigator.  These people were spoken to.  They were consulted.  They were listed as witnesses.  They were subpoenaed.  The fact that they were subpoenaed and here for trial doesn't mean he should have called them.  It just means that a lawyer prepared and, depending on how the trial was presented, could have been able to call them if they were needed.  The testimony is they both decided, from [counsel], that this was the way they would go.

So I guess what you're asking me as part of the defense is is not to believe the 20-some year board-certified criminal lawyer when he says, "We talked about it and made this decision together."  The reality is is they had to talk about it because the decision was made for him to testify, the client, and the decision was made for Ms. Karnosh to testify.  So somehow they discussed beforehand that he would testify, that Ms. Karnosh would testify, that this would [be] the strategy they'd use as far as both of their testimony, but somehow the discussion about Ms. Miller never occurred, or any other witnesses, and [counsel] just made that his decision on his own.

And the testimony against that is your client's testimony he now, serving a life sentence, that "No, I'm telling the truth under these

circumstances and [counsel's] not." Frankly, [counsel] has more credibility and common sense dictates that given the decisions that were made under the circumstances, the additional decision as to whether to call Ms. Miller or the other witnesses were also discussed and that decision was made. It just makes common sense. They discussed his testimony, they discussed Karnosh's testimony, but [counsel]  - - and they arrived on a strategy for that, put Karnosh on, put him on, but somehow [counsel] unilaterally made the other decisions about the other witnesses? That just doesn't make sense, aside from the fact that he's board-certified, that he's testified - - or that he's practiced in front of me on a lot of occasions, and I know he goes out of his way to discuss with [a] client what goes on in particular cases and understands what his professional responsibilities are.

So they both decide. It's never complained of to the Court. Mr. Demarest says after the fact, "I didn't know I could." Okay, fine, that's his statement. You know, and you've got to superimpose all of that on the case where there's a written confession that he admits that's his signature as to what he did, so.

And in this case, the defense did call [Karnosh] and it seems to me for good strategic reasons. One, she's not a relative. Two, she talked about the relevant periods that were alleged as far as the State was concerned, and established what they hoped the defense would be, which was that he had a lack of opportunity.

I just have to disagree . . . that the testimony with Ms. Miller would - - I think it would have been inconsistent for the reasons that [counsel] indicated. And the whole melding together of what days it did or didn't occur, I'm not sure - - I mean, you know, and that's a strategic decision that he made and chose not to do, and I think, based on all of the record before me, for good reason.

I just don't see that it would have improved the situation, especially with my earlier remarks about nothing about this whole time frame between 3:30 and 5:00 or 5:30 being testified to and it's something that seems to have come up after the fact, both from your client and from Ms. Miller, not at the time when the depos were done and where the original testimony was brought forth.

And so, you know, to say that somehow that performance is deficient, I don't even agree that the first prong is made. I mean I think he did it exactly the way, in hindsight, it should have been done under the circumstances and I think it was discussed with the client and they agreed on it. You know, there's no - - you don't get years after the fact to say, "Well, it turned out bad so now we're going to second-guess and say we could have done it a different way, especially when now some additional facts are brought out years later that the witness supposedly could testify to, which reasonably wasn't - - I mean those things weren't mentioned or somehow they didn't get mentioned in the objective record that I have in front of me.

So I really don't see - - haven't seen, for the reasons I've indicated, where the deficient performance is. I think it was a strategic decision. I think it was discussed and, frankly, I think it gave him the best opportunity to try and secure an acquittal. That it didn't work out is not a priori therefore [counsel's] fault and a deficient performance by the attorney.

And clearly the second prong, that it would have changed or affected the outcome, hasn't been indicated. I certainly don't think there's deficient performance in not having the nephew, because frankly his testimony, even though the State objected to it and said, "Don't allow him to bring it in the hearing," I did allow him to bring it in, and there's really nothing that he adds or adds to the testimony of Ms. Miller. If anything, it's a little inconsistent, and so I don't think not calling the nephew was somehow deficient performance.

And, frankly, Ms. Smith's testimony doesn't add too much. I mean she knows that they went to football practice, but it seems from the testimony of the minors as to what occurred that the relevant times are really 3:00 to 5:00 or 5:30, not the 6:00 to 8:00 football practice that everybody's testified about. So I can't see how any argument could be made that somehow if these witnesses had testified it would have improved his position with the jury, especially in light of the overall case. And you can't take away - - I mean, you know, once the motion to suppress was denied by the Court, and those statements were coming in, you can't take away those statements and so you have to think of the best way to counteract those statements and decision was made, I think with Mr. Demarest's participation to handle it in the way that it was handled. Just because it didn't work out doesn't mean that it was deficient performance on the part of [counsel].

And so based on the evidence before me and the record before me, I don't see that either prong of *Strickland* was met. I don't believe that there was deficient performance for the reasons I've indicated, and I certainly don't think that anything that's been put on the record would suggest that the outcome would have been different or the reliability of the proceeding, that confidence in that would be undermined. I don't make that finding at all under these circumstances.

And so, as a result, based on the finding that the two prongs of *Strickland* have not been met, the Court will deny the motion for the 3.850.

(Dkt. 11, Ex. 20, pp. 267-75). The court also entered a written order finding "[counsel's]

testimony more credible than the Defendant's testimony" and that "[t]he choice to call Ms.

Karnoush was clearly strategic and for good reason. Ms. Karnoush was not a relative, lived

in the home with the Defendant, his wife, and the victims, and established that the victims

were not alone with the Defendant during all relevant time periods. The testimony of Ms.

Miller and Ms. Smith would have contradicted Ms. Karnoush's testimony that the victims were with her."  (Dkt. 11, Ex. 21, p. 175.)

Demarest fails to show that the court unreasonably applied *Strickland* in rejecting his claims.  Deference must be given to the state court's finding that counsel's testimony was more credible than Demarest's testimony.  *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over [the petitioner's].");, *cert. denied*, 526 U.S. 1047 (1999); *Devier v. Zant*, 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are . . . entitled to the same presumption accorded findings of fact under 28 U.S.C. § 2254(d).");, *cert. denied*, 513 U.S. 1161 (1995).

Further, counsel is presumed to have made all decisions in the exercise of reasonable professional judgment.  *Strickland*, 466 U.S. at 690.  "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one [a reviewing court] will seldom, if ever, second guess."  *Waters v. Thomas*, 46 F.3d at 1512. "The inquiry into whether a lawyer has provided effective assistance is an objective one: a[n] [applicant] must establish that no objectively competent lawyer would have taken the action that his lawyer did take."  *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002).  Counsel's decision to call Karnosh rather than Miller, Smith, and Demarest's nephews[10] was, according to the testimony the state court found credible, a

_____

[10] The state court denied Demarest's claim that counsel was ineffective for not calling various family members.  Demarest does not show that counsel was ineffective under *Strickland* for failing to call any of his three nephews. Other than the information to which J.P.B. testified at the evidentiary hearing, Demarest does not identify any specific information that any of his nephews could have provided.  Rather, he appears to argue they all would have testified that the victims were at their home prior to football and cheerleading practice and

strategic choice with which Demarest agreed.  There is support for the court's finding that counsel did not provide ineffective assistance under *Strickland* when he made the strategic decision to call Karnosh, instead of Demarest's family members.

In evaluating a claim of ineffective assistance of counsel on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."  *Richter*, 562 U.S. at 101.  "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.* at 105.  The court's findings that Demarest failed to establish either prong of *Strickland* are supported by the record.  Accordingly, Demarest does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying these claims.

## II.

Demarest additionally claims that counsel was ineffective for failing to conduct an adequate pre-trial investigation.  He alleges that counsel should have investigated facts surrounding the victims' activities after school, such as the time and location of cheerleading and football practice, how long it took to get there, and who was present during the car rides.  Demarest also asserts that counsel should have investigated Miller's videotapes and obtained a schedule showing when and where practice occurred.  He further argues that counsel should have investigated the coaches and "other witnesses"

---

then rode with them to practice. Their testimony would have been cumulative and Demarest fails to show how any such testimony could overcome counsel's strategic decision to call Karnosh.  Accordingly, Demarest fails to establish that counsel provided ineffective assistance under *Strickland* for failing to call any of his nephews.

present with the victims "at the time these allegations were to have taken place." He claims that, had counsel undertaken such an investigation, counsel would have been able to establish a timeline showing that the victims were not alone with Demarest after school.

Demarest failed to assert the claim that counsel was ineffective for not conducting an adequate pre-trial investigation in either his initial or amended postconviction motion. (Dkt. 11, Exs. 6, 17.)  Therefore, the claim is unexhausted.  Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state postconviction motion.  28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.").  *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted).  A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845).

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim.  *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364,

365 (1995)).  A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  *Pruitt*, 348 F.3d at 1358.  The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).  The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim.  28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."  *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court."  *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999).  *See also Murray v. Carrier*, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions.  *United States v. Frady*, 456 U.S. 152, 170 (1982).  The petitioner must show at least a reasonable probability of a different outcome.  *Henderson*, 353 F.3d at 892; *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96.   A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892.

Demarest cannot return to state court to file an untimely, successive postconviction motion. *See* Fla. R. Crim. P. 3.850.  Consequently, the claim is procedurally defaulted.  *See Smith*, 256 F.3d at 1138.   In his reply, Demarest asserts that the Court should review the merits of this procedurally defaulted claim under *Martinez*.  Thus, he appears to assert that he has shown cause for his procedural default. Typically, ineffective assistance of postconviction counsel does not constitute cause to excuse a procedural default because there is no constitutional right to counsel in state collateral proceedings.  *See Coleman v. Thompson*, 501 U.S. 722, 753-55 (1991).  But the Supreme Court has recognized a narrow, equitable exception to *Coleman*:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, 132 S.Ct. at 1320.   In *Martinez*, the Supreme Court provided that the exception is available when a criminal defendant is required to raise ineffective assistance of trial counsel claims in a collateral proceeding, rather than on direct appeal.  132 S.Ct. at 1318. This exception has been extended to situations in which, even if a state's procedures technically permit a defendant to bring a claim of ineffective assistance of trial counsel on

direct appeal, in practice, "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, _U.S._, 133 S.Ct. 1911, 1921 (2013).

Demarest relies on *Martinez* in asserting cause to overcome the default of his ineffective assistance of trial counsel claims.[11] Even assuming the other circumstances set forth in *Martinez* are met, Demarest must show that his defaulted claims of ineffective assistance of trial counsel are "substantial."  The Eleventh Circuit Court of Appeals has discussed this requirement:

> *Martinez* articulated the "substantial claim" requirement as follows:
>
>> To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (describing standards for certificates of appealability to issue).
>
> *Martinez*, – U.S. at –, 132 S.Ct. at 1318-1319.  Neither *Martinez* nor *Trevino* elaborated on or applied this standard, but we take the Court's reference to *Miller-El* to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).
>     As the Court explained in *Miller-El*, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S.Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000).

---

[11] Demarest filed his initial postconviction motion *pro se*.  It appears that the state court appointed counsel during the pendency of Demarest's motion.  Counsel filed an amended motion with regard to ground two and represented Demarest at the evidentiary hearing.

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1269-70 (11th Cir. 2014) *cert. denied sub nom*

*Hittson v. Chatman, Warden*, No. 14-8589, _U.S._ (June 15, 2015) (footnote omitted).

The Court concludes that Demarest has failed to present a substantial claim of ineffective assistance of trial counsel that has "some merit."  His assertions that counsel should have investigated factual details concerning practice and should have reviewed Miller's videotapes are vague and speculative.  Furthermore, Demarest fails to identify the "other witnesses" allegedly present or the coaching staff he believes should have been interviewed and presents no evidence reflecting what their testimony would have been.[12]

Moreover, as the state court noted with regard to his other ineffective assistance claims, the time during which the practices actually took place was not relevant because it was later than the time during which the crimes were alleged to have occurred. Additionally, Demarest does not establish a reasonable probability the outcome of trial would have been different had counsel uncovered such information in light of the evidence against him and counsel's strategic decision to call Karnosh to counter the victims' testimony concerning their whereabouts after school.  Demarest fails to establish either deficient performance of counsel or resulting prejudice.

Accordingly, Demarest's claim that counsel was ineffective for failing to conduct an adequate investigation of the circumstances surrounding his case is not a "substantial" claim of ineffective assistance of counsel under *Strickland* to overcome the procedural

---

[12] *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted); *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful.  This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir.1985)).

default.  Consequently, the cause and prejudice exception is not established.  Additionally, Demarest makes no argument or showing that the fundamental miscarriage of justice exception would apply.  Demarest is not entitled to relief on Ground Two, Sub-claims A, C, and D.

Sub-claim (E)

Demarest asserts that counsel was ineffective for not securing his presence at depositions of "key state witnesses." (Dkt. 1, p. 16.)  He states that, if he had been present, he would have "discussed with counsel areas of cross-examination that would have identified conflicts in testimony of key state witnesses and other witnesses" to show that the victims were with Michelle Miller.  (*Id.*)

After Demarest filed his initial postconviction motion in state court, he filed a motion to supplement in which he raised this claim. (Dkt. 11, Ex. 10, p. 93.)  However, the state court dismissed his motion to supplement because Demarest's attempt to raise new claims of ineffective assistance of counsel after the two-year filing period under Rule 3.850 was untimely, and because the motion did not contain an oath as required under that Rule. (Dkt. 11, Ex. 11, p. 102.)

A petitioner's failure to comply with state procedural rules governing the proper presentation of a claim typically bars federal review of that claim in a subsequent federal habeas proceeding.  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Sims*, 155 F.3d at 1311. "However, a state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground."  *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).  A state court's procedural ruling constitutes an independent and adequate state rule of decision

if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying on a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." *Id.* (citing *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)).

The state court's rejection of Demarest's claim of ineffective assistance of counsel rested upon an independent and adequate state procedural bar.   Demarest failed to properly present the claim to the state court.   Consequently, the claim is procedurally defaulted.   To the extent Demarest argues in his reply that *Martinez* applies to overcome the procedural default, he cannot obtain relief.   Demarest has failed to present a substantial claim of ineffective assistance of counsel.   His claim is vague and conclusory.   Demarest does not name the "key state witnesses."   Nor does he identify any information that he only could have told counsel had he been present at depositions.   Demarest additionally fails to allege a reasonable probability that such information would have affected the outcome of trial.   Thus, Demarest establishes neither deficient performance or prejudice under *Strickland.* As Demarest does not demonstrate a substantial claim of ineffective assistance of trial counsel, he fails to establish that the cause and prejudice exception applies to overcome the procedural default.   Demarest does not allege or demonstrate applicability of the fundamental miscarriage of justice exception.   He fails to overcome the procedural default of his claim and is not entitled to relief on Ground Two, Sub-claim E.

<u>Sub-claim (B)</u>

Demarest asserts that counsel was ineffective for failing to properly convey a plea

offer made by the State.  He states that counsel did inform him of a plea offer for ten years in prison, followed by twenty years of probation, but that he rejected this offer because he thought the probationary term was too long.  Demarest contends, however, that he later learned the State's offer was for ten years in prison followed by ten years of probation.  He also claims that "[d]uring appeals" he learned the offer was for ten years in prison. He claims that counsel did not relay the offers to him, and that he would have accepted them rather than go to trial.[13]

In his postconviction motion, Demarest asserted only that counsel was ineffective for failing to convey an offer from the State for ten years in prison followed by ten years of probation.  In reviewing Demarest's  claim, the state court referred to counsel's statements at the motion to suppress hearing indicating that Demarest would not permit counsel to present an offer to the S for ten years in prison:

> COUNSEL:   I've explained that if he's convicted, that he's facing mandatory life sentences.  Even if he's acquitted on one and found guilty on the other, he's facing mandatory life sentences.  And I'll certainly - - if we end up in trial I'll do everything I can to obtain not guilty verdicts.   But at the same time, it's been my recommendation that we should make an offer of ten years, but I don't believe that my client is authorizing me to do so.

(Dkt. 11, Ex. 1, Vol. II, p. 134.)[14]   Relying on this statement, the state court rejected Demarest's argument that counsel was ineffective for failing to convey an alleged offer from the State for ten years in prison, followed by ten years of probation:

---

[13] It is not clear whether Demarest claims that the State made multiple offers, or that the State made one offer but that he has obtained varying information about the exact terms of that offer.

[14] The State took the position that it would no longer be willing to negotiate with Demarest if he went forward with the hearing on his motion to suppress.  (Dkt. 11, Ex. 1, Vol. II, p. 134.)

The record reflects that the court held a hearing on the Defendant's motion to suppress on March 22, 2004.  At the hearing, the State informed the court and the Defendant that if the Defendant proceeded with the motion to suppress, the State would not enter into any more plea negotiations.  The Defendant's counsel told the court that counsel wished to convey an offer of ten years to the State on the Defendant's behalf, but the Defendant did not wish to convey such an offer.  The Defendant was present when counsel made this statement but did nothing to indicate that counsel's statement was false.  Therefore, the court finds that the Defendant's assertion that he would have accepted a ten year prison sentence followed by ten years of probation is illogical when the record reflects that the Defendant did not find an offer of a ten year prison sentence acceptable.  This claim is denied.

(Dkt. 11, Ex. 9, p. 42) (court's record citations omitted).

Demarest asserts that counsel failed to advise him of the offer of ten years in prison and ten years of probation, and that he would have accepted the offer had counsel informed him of it.  The record reflects that Demarest was present in the courtroom but did not object or protest when counsel stated that he did not believe he had Demarest's authorization to make an offer of ten years.  (Dkt. 11, Ex. 1, Vol. II, pp. 131-34.)  Later in the same proceeding, Demarest indicated that he understood everything that had been discussed.  (*Id.*, p. 138.)  Demarest makes no assertion that he did in fact authorize counsel to make the offer.  Thus, there is support for the state court's conclusion that, because Demarest was unwilling to permit counsel to offer ten years, there was no basis to believe he would have agreed to a longer sentence of ten years in prison followed by ten years of probation had the State made such an offer.  Demarest has failed to show prejudice.  Accordingly, he does not establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim.

To the extent Demarest asserts the State made an offer for ten years in prison about which counsel failed to inform him, he is not entitled to relief.  Demarest did not present this

assertion in his state court pleading.   Although a petitioner is not required to present a verbatim restatement of claims brought in state court, a habeas petitioner may not present a particular factual instance of ineffective assistance in his federal habeas petition that was not first presented to the state courts.   *See McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005); *Johnston v. Singletary*, 162 F.3d 630, 634-35 (11th Cir. 1998); *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992).   When a petitioner raises an ineffective assistance of counsel claim in state court, but alleges different supporting facts for the same claim in his federal habeas proceeding, he has failed to fairly present the federal claim to the state court.   *See Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (citations omitted).   *See also Weeks v. Jones*, 26 F.3d 1030, 1044-46 (11th Cir. 1994).   Accordingly, Demarest's failure to present this claim to the state court leaves the claim unexhausted.   He cannot return to state court to file an untimely, successive motion under Florida Rule of Criminal Procedure 3.850.   *See* Fla. R. Crim. P. 3.850(b), (h).   Consequently, the claim is procedurally defaulted.

To the extent Demarest argues that *Martinez* applies to overcome the default, he has failed to present a "substantial" claim of ineffective assistance of counsel.   The state court's reasoning would apply to this claim.   The record indicates that Demarest had no interest in agreeing to a ten-year prison sentence.   As he would not authorize counsel to offer a plea deal of ten years, any assertion that he would have accepted the same offer from the State is insufficient to show prejudice.   Because Demarest fails to show prejudice, he has not established a substantial claim of ineffective assistance of counsel under *Strickland*.   Demarest has not demonstrated cause and prejudice excusing the procedural

default of his claim.  Nor does he allege or show that the fundamental miscarriage of justice exception applies to overcome the procedural default.  Accordingly, Ground Two, Sub-claim B warrants no relief.

It is therefore

**ORDERED AND ADJUDGED** that Demarest's petition for writ of habeas corpus (Dkt. 1) is **DENIED**.  The Clerk is directed to close this case and enter judgment against Demarest.

It is further **ORDERED** that Demarest is not entitled to a certificate of appealability. A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition.  28 U.S.C. § 2253(c)(1).  A district court must first issue a certificate of appealability (COA).  *Id.*  "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* at § 2253(c)(2).  To make such a showing, Demarest "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).  Demarest has not made this showing.  Finally, because Demarest is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on March 14, 2015.

Charlene Edwards Honeywell
United States District Judge

Copy to:
Richard B. Demarest, Jr.
Counsel of Record